May it please the Court. James Thompson on behalf of Mr. Pope. I'd like to reserve two minutes of my time for rebuttal if I might. You can try. Rochelle Nublio was the witness in this particular case. She was 11 years old at the time of the sighting of the individual that she later, after some time period, identified as Mr. Pope. She could not hear, she could not speak, and at that point in time she was just beginning to learn how to sign as her main course of language. She was not as advanced developmentally as other girls her age as well. She was the only eyewitness of the person who went into the Thomas' house that day. On February 12, 1985, when she was at her house, she was playing with her dog in the house next door. She saw a strange man driving... We are familiar with the facts, so you can save yourself the time. I mean, the difficult issue as to the identification is we have a state court finding, a state court that actually saw the lineup, actually saw the videotape of the live lineup, and we have a finding which gets great deference in the FA that the lineups, both of them, were fair. And I am not unsympathetic, personally, to your difficulty of the case, or the position your client is in, in sort of having conviction that hinges, you know, a very serious conviction that hinges on identification of the witness who is trouble communicating, probably had some trouble in perception because there was some distance, and nevertheless, and may have been influenced by a lineup, nevertheless, we have findings from the state court. What do we do about those? Tell me how we get around that. I think the state court findings are unreasonable in the sense that the first thing that they do is... You expect us to put our heads through that brick wall, find the state court findings unreasonable. This is sort of the hardest thing. I mean, if that's all you've got, that's what you've got. No, that's the first part. The second part is that it's an unreasonable application of the law from Manson, Biggers, Simmons, and other cases. I mean, there's two things that are going on. But that hinges on the facts. If the lineup was fair, if the lineup was perfectly fair, right, if they're all black, fat guys with afros, right, then everything else flows, right? Then all those cases don't make a difference because it really hinges on the state court finding that the lineup was fair. Everything hinges on that. That's correct. And you are asking us to reverse that, and you don't even give us the lineup or the videotape to look at. How much magic do you think we can perform in federal court? I do think the court can perform a lot of magic, but that's not what I'm trying to ask the court to do. With respect to the fact that the court does not have the lineup photos or the videotape, it was our understanding that that entire record was delivered to the district court in Oregon, who ultimately decided this case. And there's several references in the ruling, which comes right after the fact of the discussion of the lineup, in which it says, I have reviewed the record in full and conclude, and also at the end, upon full review. We assume. There's nothing about it that says that the court reviewed the lineup. There's nothing about the court saying that they actually looked at the photos or looked at the lineup. As I say, when the state filed its answer, it made reference to the videotape, at least, if not the photos, in their answer, and then filed the lodged record in the district court. But the question I have is, you know, why normally you would look to see if the photos, wouldn't those be a key part of your excerpt of record? I mean, in other words, the reason I know they're not in the district court file and that we know is because we've looked, but we wouldn't, although we have access to the whole file, we also look heavily to the parties for their excerpts of record. So it's not clear how we would have been reviewing this without even, you know, forget the videotape, that you can't put that in the excerpt in the normal way, but why not the photos? They weren't included in our excerpts because we thought that they were part of the record and that they would be reviewed when this court had them or when the district court transferred them. But that's kind of not really answering my question. And the parties are asked to make an excerpt of record. And there was a reason for the excerpt of record, so that we don't have to dig through what I think are five or six boxes of the district court file. I understand. And I don't have a copy of the photos or the videotape myself. I represented Mr. Pope at trial. I'm very well aware of the lineup and the videotape, and I was aware of them before we filed the petition for him, just a couple of days before the AEDPA statute ran on his particular case. Then the case, then we filed it in the district court in Sacramento, California. Right. No, we have your papers on that. Let me just ask a question. Yes. If we can get the photos, obviously, then we can look at them, and then we can benchmark those against your argument. And we can see some of the things that are described about these other individuals in the lineup. But let me just ask you, what would happen if the photos and video can't be located? I'm fairly confident they can be located. We've put out feelers, and I'm hoping that we'll be able to get them within 14 days. So you wish? That's not my question. If we get them, that's the easy question, and although we still have to resolve the legal question, which we can do, what happens if we can't get them? I think it has to go back to whether the state court was fair in its interpretation of the lineup and the facts. As described to us in the various papers. Right. Okay. What I'm trying to say is that when the state court made the ruling Sorry, I did not understand your answer. I'm sorry. I didn't understand your answer. Or maybe you hadn't finished your answer. That's what I was trying to do. Okay, go ahead. The state court first found that one of the persons in the lineup should not have been included in the lineup because they were so diverse from the other individuals, which leaves the state with a four-person lineup. And the only thing that the state did with respect to the lineup, because they did not look at reliability, they only looked at suggestiveness, was to state that Mr. Pope did not appear to be paunchier or larger than the other three subjects. That's the extent of the ruling by the state court of appeal on the lineup itself. If you go to reliability, which neither the state court nor the district court went to, the reliability factors are such that it shows that this was not only a suggestive lineup, but that under Manson, the key or the linchpin to it is the reliability factors. And in this case, as to its suggestiveness, the persons are not the same in key characteristics. The state appeal court discounted the one person, so it was a four-person lineup. The lineup was conducted with an interpreter who was not qualified at the time, and then we had a psychologist who testified that in their expert opinion, from a psychological perspective and an eyewitness identification expert, testified that the lineup was not fair. And then as to prove that point, conducted two separate studies, which showed the basis of the lineup to 96 separate individuals who looked at it and chose Mr. Pope 87 and 88 percent of the time, which means that the state court's finding of it being a not suggestive lineup, I think, fails. Mr. Pope was 10 to 20 years older than the other persons in the lineup. He was the only person without facial hair. He was the fattest person by far with his stomach. I'm sorry. I thought there were two people without facial hair. I believe there's only one person without facial hair. One person they could not tell from, I think, the side that didn't have it, but there was only one person with facial hair. And he was the only one with bushy hair. Now, the person with the stomach, the belly hanging over the stomach, is significant in the sense that in this case she saw a profile of this individual as they went up to the house. So that is significant. With respect to reliability factors, the opportunity to view the person, she only saw him twice at a distance, only saw his profile, couldn't see whether he had facial hair. Rose Bush is in the driveway. There was a Cadillac parked in the driveway. All affected the view and saw him while she was playing next door. As to the degree of attention, she was playing with her dog in the yard and not focused on the sighting. As to the accuracy of the prior description, she only gave a description as fat with bushy hair to her sister, to her brother, and to her father. And she had slightly more details in her subsequent interview, but that was it. As to the degree of certainty, she was not certain at all. The trial rebuttal testimony when she was called back by the prosecution, she confirmed that as a preliminary examination she was told to pick somebody out. And she said she didn't know if she had seen anyone in the lineup who saw that person drive Zach's truck. And she said she did not know why she had chosen number four of the lineup. And then finally, the time between the sighting and the lineup is five, almost six weeks, between the time period that she saw the individual and the time period that the lineup occurred. And the lineup occurred with respect to a person who had translated the signing who was, if we had an expert testify, not qualified to sign properly. So on those bases — »» Did Shulman Lane only testify at the suppression hearing? »» No. He testified in front of the jury as well. »» Thank you. »» So if you take all those things into consideration, there's not a factual basis that the state can say that's not impermissibly suggestive so as not to even go to the reliability factors, which is what both courts did in this case. And it seems that given the amount of question about the lineup, and in this case not just having a lineup presented but having an expert testify, having the interpretation problems, having the two studies that also demonstrate that there is a problem, all indicates that there's a sufficient showing of suggestibility to at least have the courts turn to reliability. And neither court did that. So the state court's finding I don't think can be allowed to stand on because it wasn't a complete finding. And they themselves admitted that one of the persons shouldn't have been in the lineup. So now we only have a four-person lineup. »» Okay. Thank you. I'm going to hear from the governor. »» May it please the Court. Justin Riley on behalf of the Respondents' Appellees. I believe Justice Kaczynski actually stole my argument before I got up. And basically at the heart of each of Appellant's claims, each one of the claims he presents here is a state court factual determination. With respect to the lineup, both the state trial court and the state appellate court reviewed the lineup claim. And both the trial court and the appellate court had a chance to see the videotape, the lineup, the testimony, and the trial court made a factual determination. »» What did they make of the study involving the children? I thought that was pretty powerful stuff where the children are given the description and then not ever having seen any of these people, a very high percentage of them, 87% or something, pick the defendant. What did the state court say about that? »» The trial court didn't say too much about it. But it's important to note that. »» What did it in fact say about it? »» The facts? In fact? »» It said not too much. »» What I'm asking is not whether it was a lot or a little. What did it say about it? Whether it be a lot or a little? »» I recall that the state trial court just mentioned that they looked at the lineup and didn't find it persuasive. I believe the state appellate court gave it about a... »» I don't really want your beliefs. What I'm asking is what did the court do? And that's not a question of your beliefs. That's a question of what's in the record. »» That's true. »» Okay. »» I'm sorry. »» Go ahead. Tell me what the state court said on that point. »» I believe it's at ER, excerpts of record 83, I think that's a J. It references page 2,591 of the reporter's transcript or maybe the clerk's transcript. I can't tell from this. I'm sorry. There seems to be a page out of place. Skip over to, I'm sorry, excerpt of record page 84. »» I'm sorry, page what? »» 84. »» 84, okay. »» 84? »» Yes. »» What document is that in? »» That is in the excerpts of record. »» No, no, no. What court document? »» It's the appellant's excerpt of record. I'm assuming that it's a clerk's transcript because I believe it's a preliminary hearing. I couldn't say for sure. My excerpts of record have a few pages taken out. So there's an excerpt of record 83F. You'll see at the top there's a 2587. And then there's about three or four pages in the way that kind of don't seem to address the issue. But if you start at 83F and then skip over to 84. »» I'm looking from 2587 to 2588. »» I'm sorry. I'm looking at 2587, 2588, 2589. You're right. I'm sorry. But after that it goes to 2588 again. I'm looking at 2588 at 84. »» I get 2590, 2591. Would you like to have my excerpts? »» No. After 2591 it goes to 2588 again. And that's what I was looking at. So after 2588 it goes to 2592. I don't know if they got out of order somewhere. »» Well, 2588 comes in there. But then there's 2592 and 93. »» That's where my confusion was. I apologize. »» Okay. So what's my question? »» Yes. »» I'm sorry. I lost it again. »» Did the state court say anything at all? »» The state court definitely said that it reviewed the reports by the expert. »» I understand. But how did it deal with them? What did it say? »» Okay. Maybe I can. There's a lot of different excerpts. But I'm actually looking at the Court of Appeal in footnote 8 of the Court of Appeals decision, which is excerpt 189. But, of course, it might appear in multiple places. In footnote 8, the State Court of Appeals talks about the studies and says they're interesting but not relevant and then goes on to parse them out. »» I'm sorry. I was looking specifically for the trial court dealing with that. But I'm sorry. I just can't find it right now. I'm flipping around and I'm just missing it, I'm sure. I would note that, though, at 2587, the trial court does mention that the statistics, the raw statistics of each of the individuals that showed up in the lineup seem a lot more heterogeneous than the pictures in the videotape actually show. I took from that that just looking at the raw facts, we can't. »» Where are you reading from? »» That's 83F, 2587. »» Is that the trial court you're reading now? »» I believe so, yes. At line 11 on 2587, which is excerpt of record 83F, that starts the paragraph. »» That then brings us to the final factors. »» Yes. And then at about line 15, »» Where are you? »» Line 15. »» Okay. »» It starts in about three words and it says, and in my judgment the listing of the personal statistics of the individual members of the lineup makes them sound or appear to be further apart physically than they truly appear when you see them together on the videotape or in the pictures. »» Right. That has nothing to do with the studies. »» That's true. That's true. »» Which is the question I asked. »» Yes. I'm sorry. Let me answer that by saying I cannot find it right now. But I do know that they »» So we have the Court of Appeals dismissing it as being interesting. »» Yes. »» But not relevant. What do you think about that rationale? »» Well, they got to see the pictures in the videotape. The Court of Appeals looked at the videotape and the pictures. If you have an expert telling you that five separate photos you have in front of you are different and you're looking at the five photos and you can see that they're not as different as all that, then you say, oh, interesting. »» That's not what the expert said. This is Shomer. This is the one who conducted the study of the children, right? »» Oh, okay. I'm sorry. Yes. Specifically about when he showed them to the children, the photos? »» And the Court of Appeals said, oh, well, this is sort of interesting, but it doesn't really tell us much. But the Court of Appeals is wrong about that. What it does tell us is quite a bit. In fact, when you try to apply the description of the suspect to the picture that is given, that one of the pictures stands out. It's picked far more often than the others. And the Court says, well, these children didn't see the individual. The person did see the individual. But it strikes me that they were simply misunderstanding what the studies were about. It was not a question of whether the children had seen the individual. This was a question as to whether or not the pictures were equally likely to raise a response from somebody given the description of the suspect. And the fact that 87% of the children picked the picture of the defendant is pretty strong proof to me. I mean, it's pretty, you know, if I understand what they were doing there, it's pretty strong evidence that the four things were not equivalent. Otherwise, you would expect 17 of the children to pick each of the five pictures. Right? If one of the pictures wasn't particularly keyed into the description of the suspect. That's the point, and the Court of Appeal seems to have just completely missed it. Isn't this Taylor v. Mannix? Isn't this exactly the kind of situation where we can say, look, the Court of Appeal just didn't get it. They just didn't understand what the evidence was, and therefore its fact finding is defective. Isn't this Taylor v. Mannix all over again? And I know how much your office loves Taylor v. Mannix, because your boss mentions it every chance he gets. But there it is. I don't believe that we can just throw out all those factual findings just based on this study, no. I don't believe that they completely ignored the study as well. Well, but they do seem to have missed the boat. The trial court, as best we can tell, I wasn't able to find it. Maybe you can go back and find some discussion of it when you're not standing there on the fire. But the trial court says nothing at all, and the Court of Appeal just misses the boat. I mean, it makes no sense whatsoever. It is almost like, gee, we've decided those studies don't matter, and we're going to write something that makes it sound good, if you don't think about it too hard. Yes. Yes is right. Did you say yes? What was the question? I think I missed the— Whatever it was, you said yes. I won't hold you to that. What do we do with this? What do we do with this? The state court, I mean, they put in a study. I mean, there are many ways in which one could challenge studies. One could say that Dr. Shomer is a charlatan. I mean, I'm not saying he is. There's one way one could attack a study and say, look, he's a charlatan. His degrees are forged. He doesn't have any experience. There's a way of doing it. Or one could say the procedures, the protocol used in the studies were defective, and here's why the protocols were defective. One could say the studies are not—you know, don't tend to prove what they show, and then give the rationale and say, look, this is why the reasoning doesn't work. But what the Court of Appeals does here is none of these things. It comes up with something that is laughable in its face. What do we do with that? Okay. The Court of Appeal basically—I wouldn't say dismissed the study, but gave it short shrift because the results of the study weren't the standard. The standard is—basically what the Court of Appeals said is you're not entitled to a lineup of clones. You know, if a study says, you know, they picked one considerably more than the other, that's not necessarily what he's entitled to. He's not entitled to a suggestive lineup. And I must admit I wasn't paying— I'm sorry. I thought he was entitled to a lineup that does not single out a defendant in a way that would make it— that would undermine the reliability of the procedure. So if you put one black guy with a bunch of white guys, or if you put one man with six women or five women, or if you put a guy that has an ear missing and everybody else has two ears, and the defendant had one ear, then that's not a lineup. Right? I think we're talking the same language. Yes. Okay. So I find it at least highly relevant. I'm not sure, you know, it's irrefutable, but highly relevant that when 97 children, or I forget, 90-odd children are given the description of the suspect, and then they wind up picking people who know nothing else about the event, and they wind up picking the one picture by overwhelming margins. I mean, I don't know how to explain that. I don't have a lineup here to look at, but I have a very hard time saying that rational people would dismiss that as being just a game. I find that kind of comment on it not a serious, not something that deals seriously with the matters, obviously, of life and death interest to both the defendant and the state. Obviously, we need to see the lineup, but I just, here is the trial court testimony. It's ER83F. Yes, I found it as well. Line 24 where he says, I am, of course, aware of Dr. Schomer's testimony and of his study in which he presented the still photos to school-age children in Los Angeles and Sacramento and got overwhelming response to suspect number four. However, in my judgment, Rochelle was much less likely than any of these people to pick out the wrong person because she did see someone, unlike those people, those children who were test subjects. And because she did see someone, while she can't necessarily describe it in detail, she has a mental image of the person that she did see. So there is that statement, which I think you were close to finding, but had to put your finger on. Anyway, we'll take a look at that as well. So can your office come up with those pictures and the tape? We have. I don't know if you saw the fax that we sent you late Friday after I got this court's order. Believe me, we get those faxes immediately. Okay, great. Which is why I asked you the question. Okay. The last avenue of this office getting the materials is through the State Superior Court. Okay. We have put a rush order in to get the case filed. This office doesn't keep those things, even as the case is percolating through the federal courts? Our office? I'm sorry, I missed it. It was the DA's office, so we'll keep them. The DA purges their records at a maximum of ten years. This case is older than ten years. The district court told our office that they sent their records back to the State Superior Court, which is why I ended up there. The State Superior Court said that they – I'm sorry, the federal district court? Federal district court, yes. Sent the records back to the State Superior Court. That's what they told our office. I thought we had the records. You mean the exhibits? Apparently so. We asked them specifically for any videotapes that are occurring in the file and the photographs, and we were advised that they sent the documents to the State Superior Court, is what my paralegal told me. Maybe she confused that or the district court personnel confused that with sending them on to you. I'm not sure. I'm not altogether sure as well if the videotapes – Well, the fact is we just don't know. That's true. So you need to go look and need to advise us again after you've completed it. As we speak, I did the file. Because the difficulty is that people confuse records and exhibits. And to the extent these were exhibits to the state court, then they might be part of the record. But in the district court, they may have been exhibits. Or it may not have been before the district court. We can't tell. I can't tell either. As we speak, the file is being delivered to our office. I can't promise that the videotape and pictures are in that State Superior Court file, but I will look and notify the court immediately. You will make all efforts to get it? Absolutely. Okay. Anything further? I think your time is up. You are out of time as well, Mr. Thompson, but I'll give you a minute for a bottle if you'd like to take it. No, I think that's fine, Your Honor. I think the court has the issues. The court is correct with respect to the footnote 8 in the Court of Appeal opinion about the problem they see with the lineup, and that was that these individuals hadn't seen the defendant, which just doesn't make sense. There were 96 children that saw it. There were two separate groups of 48. Okay. There being no further questions, the case as argued will stand submitted, and both counsel are advised that they shall make all efforts to try to get us those materials. We will. And advise us of the status. We will, Your Honor. All right. Thank you. Case argued and submitted. Judge McEwen, a pleasure to sit with you, and Judge Kuczynski, I hope you're present personally next time. Thank you. I am present personally. Okay.
judges: Kozinski, McKeown, Hogan